UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| TOTAL QUALITY LOGISTICS, LLC | : | Case No. 1:17cv352 |
| Plaintiff, | : | Judge Michael R. Barrett |
| v. | : | |
| III'S HOTSHOT, INC., *et al*. | : | |
| Defendants. | : | |
| | : | |

## OPINION AND ORDER

This matter is before the Court on Plaintiff's Motion for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction.[1] (Doc. 4). The Court held a hearing on Plaintiff's motion for preliminary injunction on June 19, 2017. Following the hearing, the parties submitted Proposed Findings of Fact, Conclusions of Law, and their responses thereto. (Docs. 11, 12, 14, 15).

**I. FACTS**

Defendant Adam DeMoss began his career in the construction industry and then transitioned into sales. After a few years in sales, DeMoss began working as a driver at III's Hotshot, Inc., an asset-based trucking company. As a driver, he delivered loads to Schulz USA, and became acquainted with Luis Garza, Schulz's warehouse manager. In addition to delivering loads, DeMoss also served in an office role performing sales operations during his tenure at III's Hotshot, Inc.

---

[1] Before this case was removed to this Court, the Clermont County Court of Common Pleas granted TQL's motion for TRO. (Doc. 1-3, PageID 147-149).

DeMoss joined TQL on March 2, 2015 as a logistics accounting trainee wherein he worked with a logistics account executive to "prospect customers" and attain or move loads for customers. Before beginning his training period, DeMoss was required to sign a non-compete, non-solicitation agreement ("the Agreement").

During his training period, DeMoss also participated in a six-month classroom training course where he trained in how to get customers, how to overcome objections in sales, how to price, how to find carriers, TQL's Load Manager software, and different types of equipment in trucking. Before becoming a logistics account executive, DeMoss acquired Schulz as a client for TQL, along with DeMac & Co. – a company owned by DeMoss's cousin.

TQL fired DeMoss on June 10, 2016 for failure to meet sales goals. Present at the meeting was DeMoss's sales manager, David York, and DeMoss's sales team leader, Kevin Williams. Following his termination, DeMoss went to work for LV Shipping ("LV") on June 27, 2016. DeMoss does not dispute that LV is a competitor of TQL.

In December 2016, DeMoss left LV to start his own company – Defendant III's Hotshot Brokerage ("Hotshot") – a distinct entity from III's Hotshot, Inc. DeMoss is the sole owner and employee of Hotshot, which focuses on providing brokerage services to the oil and gas industry.[2]

On May 1, 2017, TQL filed its Complaint and moved for emergency injunctive relief, which the state court granted. TQL now seeks a preliminary injunction to prevent Defendants from using TQL's alleged trade secrets to obtain customers, vendors, referral sources, and to prevent Defendants from competing against TQL in violation of the non-compete agreement.

---

[2] TQL initially moved to enjoin both Hotshot and III's Hotshot, Inc. Upon learning the two were distinct entities, however, TQL appears to have abandoned its claims for injunctive relief against III"s Hotshot, Inc.

## II. STANDARD FOR INJUNCTIVE RELIEF

Under Federal Rule of Civil Procedure 65, injunctive relief is an extraordinary remedy, the purpose of which is to preserve the status quo. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). In determining whether to grant or deny a preliminary injunction, the Court must consider four factors: (1) whether the movant has a likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction. *ACLU Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015) (citing *Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012). The foregoing factors are not prerequisites, but are factors that the Court should balance. *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004).

On a preliminary injunction, "a plaintiff must show more than a mere possibility of success," but need not "prove his case in full." *Certified Restoration Dry Cleaning Network*, 511 F.3d at 543. "'[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation.'" *Northeast Ohio Coalition v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (quoting *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997)).

## III. ANALYSIS

DeMoss raises the equitable defense of laches, arguing TQL unreasonably delayed in asserting its rights. Whether a claim is barred by the equitable doctrine of laches is a threshold matter and thus, the Court begins its analysis here. "The elements of laches are (1) unreasonable

delay or lapse of time in asserting a right, (2) absence of an excuse for the delay, (3) knowledge, actual or constructive of the injury or wrong, and (4) prejudice to the other party." *State ex rel. Brown v. Ashtabula Cty. Bd. of Elections*, 142 Ohio St.3d 370, 371, 31 N.E.3d 596 (2014) (quoting *State ex rel. Polo v. Cuyahoga Cty. Bd. of Elections*, 74 Ohio St.3d 143, 145, 656 N.E.2d 1277 (1995).

The Agreement provides for a one-year period of non-competition. DeMoss was terminated from TQL on June 10, 2016. Thus, by its own terms, the Agreement expired on June 10, 2017. It was not until April 25, 2017, that TQL sent an email informing DeMoss he was violating the Agreement. This lawsuit followed shortly thereafter.

Defendants argue TQL had actual or constructive knowledge as early as June 2016 that he was working for a competitor and thus, waiting to bring its claims until May 2017 was an unreasonable delay. Defendants provide evidence that DeMoss's sales team leader, Kevin Williams[3], inquired about DeMoss's new job and warned him he would likely receive a cease and desist order from TQL. Defendants further contend that since DeMoss opened Hotshot, he and Williams have continued to work together to help move freight. Further still, he asserts that at least three other employees of TQL – Kevin Rayo, John Beale, and Benito Barin – were aware of DeMoss's subsequent employment endeavors.

In response, TQL focuses on the second and third elements of a laches analysis – that is, that its excuse for the delay is that TQL did not have actual or constructive knowledge of the injury or wrong. TQL argues that under Ohio law, it did not have notice of DeMoss's violation until management did, and that as soon as it did, TQL took action. (Doc. 14, PageID 740) (citing *Arcanum Nat. Bank v. Hessler*, 69 Ohio St.2d 549, 557, 433 N.E.2d 204, 211 (Ohio 1982)).

---

[3] Kevin Williams has since left TQL.

The only case TQL cites for this proposition, however, addressed the transfer of a negotiable note. *See id.* The court found that because an officer and director of the bank were aware of issues with the underlying transaction, so too was the bank. *Id.* at 556. The court therefore imputed the knowledge of the officer and director to the bank. *Id.* at 557.

*Arcanum* stands for the proposition that knowledge of officers of a corporation immediately becomes the knowledge of the corporation. *Id.* Here, TQL seeks to use that logic as a shield. TQL then, would have the Court rule, as a matter of black letter law, that knowledge of directors and officers – individuals who are sometimes not involved in the day-to-day management of a company – is the end-all-be-all with respect to imputation of knowledge. But *Arcanum* does not hold that the officer's or director's knowledge is the *only* means of placing a company on notice. *Id.* Such an inquiry is fact intensive, and depends on the internal reporting policies and the corporate structure of each particular organization. Thus, the Court cannot hold as a matter of law that *Arcanum* properly extends to an analysis of whether a claim is barred by the equitable doctrine of laches.

The sole evidence TQL provides on this issue is the speculative testimony of Marc Bostwick, TQL's risk manager. He stated only that "[he] didn't believe anyone in management or in the Legal Department knew [DeMoss was working for LV]." (Doc. 10, PageID 607). As for knowledge of DeMoss starting Hotshot, Bostwick testified that the first time TQL became aware of the new company was the result of an anonymous call "that ended up in the HR Department, and HR forwarded it over to Legal." (Id. at 607-08). This call allegedly occurred in April 2017.

Noticeably absent from the record is evidence regarding TQL's internal reporting policies. Perhaps the directors and officers were unaware of DeMoss's competitive activity, but

5

*should* they have been aware?  What is the protocol for reporting matters up the chain and ultimately to Legal?  And as far as *who* is considered by TQL to be an acceptable individual to acquire this knowledge on its behalf, TQL presents conflicting arguments.

On one hand, TQL seems to suggest that once Bostwick knew of the breach, TQL knew of the breach.  While Bostwick testified he was familiar with TQL's organizational chart, there is no evidence that he himself, as risk manager, is considered by TQL to serve in a management capacity.  Further, Bostwick admitted that he did not go over the conditions of DeMoss's employment with him, he did not supervise DeMoss, and he did not evaluate DeMoss. (Doc. 10, PageID 634).  Moreover, significantly, Bostwick conceded that despite having knowledge that Williams was doing business with DeMoss while Williams was still an employee of TQL, Bostwick made no effort to stop Williams from doing so.  (Doc. 10, PageID 638).  The Court sees two potential hurdles to TQL's claims if Bostwick is the critical player in this scenario.  First, if Bostwick is not a director or officer of TQL, TQL certainly cannot argue *Arcanum's* holding as it relates to imputing knowledge to a company applies to this case.  Second, if Bostwick is a director or officer of TQL, and he knew of DeMoss's breach (and another employee's communication with him), TQL's claims may well be barred.

On the other hand, TQL also seems to suggest that in order for TQL to have knowledge of a breach of the Agreement, the officer's or director's duties must include policing or enforcing non-compete agreements.  (*See* Doc. 10, PageID 611-13).  To the extent that is indeed TQL's argument, the Court rejects it.  If only *certain* directors, officers, or managers were suitable candidates to impute their knowledge to TQL, TQL would be able to self-servingly afford itself even more protection than it seeks to gain from the court's holding in *Arcanum*.

As TQL's counsel was eager to point out, TQL is well-versed in seeking injunctive relief from various courts in order to enforce this specific form of the Agreement. (*See* Doc. 4, PageID 226-27) (citing *Total Quality Logistics v. Siano, et al.; Total Quality Logistics, LLC v. Planes Transportation Services, et al.; Total Quality Logistics, LLC v. All Pro Freight Systems, Inc., et al.; Total Quality Logistics, LLC v. Yamko Truck Lines, et al; Total Quality Logistics, LLC v. D&L Transport, LLC, et al.; Total Quality Logistics, LLC v. Paul Snow; Total Quality Logistics, LLC v. Sarisa Freight Solutions, Inc., et al; Total Quality Logistics, LLC v. Douglas Dellinger, et al.; Total Quality Logistics, LLC v. Michael Mercurio, et al.*) The Court is therefore skeptical that TQL does not have some sort of an internal reporting policy related to non-compete agreements. Indeed, the record before the Court establishes that Williams, DeMoss's sales team leader, was aware of DeMoss's breach soon after he left TQL. Williams apparently knew TQL's policies well enough to know that DeMoss would likely receive a cease and desist order from TQL. Williams, as a sales team leader, would arguably be the most likely individual in the chain-of-command to know when a breach by one of his team members occurred. The Court is only left to speculate.

Regardless, the Court cannot, based upon the record before it, accept TQL's argument that it did not know of the breach because its officers, directors, and managers (allegedly) did not know of the breach. To do so would essentially incentivize companies to have defective reporting policies. Companies could then delay bringing suit to enforce non-compete agreements, shrug their shoulders, and exclaim "the directors and officer did not know!" The Court declines to reward a company's failure to implement or enforce internal policies to protect their rights—particularly when that company regularly pursues enforcement of the same type of Agreement.

Thus, at this stage, the Court finds itself unable to determine whether TQL's claims are barred by the equitable doctrine of laches. The Court does, however, find that TQL's delay in bringing its claims severely undermines its request for emergency injunctive relief. Given the potential strength of the laches defense, the Court is in no position to determine that TQL is likely to succeed on the merits of its claims nor can it determine whether TQL would suffer irreparable harm absent an injunction. Accordingly, TQL has not met its burden to warrant injunctive relief. The Court wishes to make clear, however, that it is not ruling at this time whether the terms of the Agreement are enforceable, and reserves ruling on the merits of TQL's claims.[4]

TQL also argues the Agreement should be equitably tolled due to DeMoss's breach of the Agreement, although it is unclear from the briefing whether TQL intends to raise this argument as a response to Defendants' laches defense. Out of an abundance of caution, the Court will therefore address TQL's argument herein.

The Agreement includes a tolling provision, which provides as follows:

> 9. <u>Covenants and Remedies.</u>
>
> (vi) It is further understood that the running of the one (1) year set forth in this Paragraph shall be tolled during any time period during which Employee violates any provision of this Agreement.

---

[4] In fact, the undersigned has previously held the Agreement is, at least in part, reasonable. For example, DeMoss takes issue with the lack of geographic scope in the Agreement; specifically, that the provision would effectively prevent him from working in the logistics industry anywhere in the world. The case cited by DeMoss was decided in 1990 and contemplated the reasonableness of a 1986 non-solicitation agreement. *Professional Investigations & Consulting Agency, Inc. v. Kingsland et. al.,* 69 Ohio App.3d 753, 759, 591 N.E.2d 1265 (10th Dist. 1990). DeMoss's argument is unpersuasive simply for that reason, as this Court has already found, as it relates specifically to TQL's Agreement, that the restriction is reasonable given the advanced technological world that exists today— certainly a much different world than 1986.

The Court is, however, skeptical of Paragraph 7 of the Agreement, which presumes that any employment relationship with a Competing Business would necessarily result in the employee misappropriating alleged trade secrets. (Doc. 1-3, PageID 25-26 at ¶ 7). Whether information constitutes trade secrets is subject to an analysis under Ohio Rev. Code § 1333.61(D) and the factors outlined in *The Plain Dealer v. Ohio Dep't of Ins.*, 80 Ohio St.3d 513, 525-26 (1997), of which TQL bears the burden of proof.

TQL essentially argues that because the Agreement includes a tolling provision, that is the end of the discussion, and it is entitled to an equitable extension of the Agreement.

TQL argues courts regularly extend non-compete agreements. In support of its argument, TQL cites two cases. First, in *Luxottica*, the Court held that the non-compete agreements could not have expired while their enforceability was being litigated. *Luxottica Retail North America, Inc. v. CAS-MAN, Inc.*, S.D. Ohio No. 1:10-cv-374, 2011 WL 6101730, *2 (Nov. 14, 2011). Accordingly, the Court determined the non-compete agreements should be equitably tolled to afford the litigants the benefit of their bargain. *Id.* Similarly, in *Rogers,* the court found the trial court had erred, in part, in denying injunctive relief. *Rogers v. Runfola & Associates, Inc.*, 57 Ohio St.3d 5, 9, 565 N.E.2d 540 (Ohio 1991). By the time the case reached the Ohio Supreme Court, the non-compete agreement, by its own terms, had expired. In balancing the competing interests, the Ohio Supreme Court found that appellee should be enjoined from competing for a period as of the date of the court's decision. *Id.*

Here, the question is not whether the Agreement can expire while its enforceability is being litigated.[5] The question is to what extent TQL should be entitled to the benefit of its bargain if it *knew* DeMoss was in breach of the Agreement as early as June 2016 but did not seek to enforce the Agreement until 11 months later. Thus, the Court finds the tolling provision is not relevant to an analysis of whether TQL's claims are barred by the doctrine of laches. Rather, the tolling provision provides a useful directive in determining how long the Agreement should be extended if the Court finds the Agreement enforceable as it relates to Defendants. Accordingly, if TQL ultimately prevails, the Court will endeavor to judicially modify the Agreement to enforce it on reasonable terms. Such a task, however, is reserved for another day.

---

[5] The Court acknowledges that the Agreement has since expired during the pendency of this litigation and thus, the undersigned would entertain such an argument at a later date, to the extent it is appropriate.

Ultimately, the issue of laches prevents TQL from prevailing at this time on the first two preliminary injunction factors. The Court finds these failures fatal to the requested Rule 65 relief. The Court need not analyze the remaining two factors. *See Gonzales v. Nat'l Bd. Of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) (holding that a finding of no likelihood of success on the merits is usually fatal to a request for injunctive relief).

## IV. CONCLUSION

Consistent with the foregoing, TQL's motion (Doc. 4) is **DENIED**.

    *s/Michael R. Barrett*
Michael R. Barrett, Judge
United States District Court